Henry, Bruce R., J.
This matter came on for a hearing on the defendants’ assertion that a document placed in evidence by the plaintiff at a previous trial in this matter was a counterfeit document. The defendants are seeking sanctions against the plaintiff, including the ultimate sanction of dismissal. After a hearing at which evidence was presented regarding the question of the document’s authenticity and after a review of the transcript of the trial held on November 8-9, 2007, the motion is ALLOWED, for the reasons which follow.
Background
The plaintiff, Nicholas Fiorillo (Fiorillo), filed the complaint in this matter on or about December 17, 1999. In that complaint, he asserted an ownership interest in the defendant corporations with the individual defendants, John Sousa (Sousa) and John Fisher (Fisher), both of whom are attorneys. Fiorillo alleged in the complaint that he witnessed various irregularities in the management of two of the entities, The Palladium and The Crystal Palace. When he brought those irregularities to the attention of the individual defendants, Fiorillo says he was wrongfully terminated by them from his position as manager of The Palladium and from his corporate positions. The defendants asserted that Fiorillo was fired for, among other reasons, illicit activities which were captured on security videotapes. The parties attempted unsuccessfully to resolve their differences and Fiorillo brought this lawsuit. In it, he makes claims of wrongful termination, nonpayment of wages, breach of fiduciary duty, and violations of G.L.c. 93A.
The 2007 Trial
In November of 2007 the case came on for trial. By agreement, the trial was bifurcated and the parties proceeded to try the issue of whether a release signed by Fiorillo in May of 1998 precluded him from making the claims he was making in this matter. The release read, in part,
I further agree to release, discharge, and forever hold harmless John C. Fisher, John L. Sousa, Oasis, Inc., and VMGI, Inc. from any and all liability, damages, claims, or civil actions of any nature that arise or may arise from or relate to the said corporations, John C. Fisher, John L. Sousa, or any other matter or parties.
The trial occurred on November 7-8, 2007. At that trial, the defendants proceeded first to establish the existence of the release. Attorney Ralph Sbrogna (Sbrogna), who was representing Fiorillo at the time that the release was drafted and signed, was the first witness.[1] He testified favorably for the defendants and indicated that the release at issue was intended to end certain disputes among the parties and that it was not contingent on any deal relating to the other entities in which the parties were involved.
Sbrogna testified that for Fiorillo the most important aspect of the settlement was his recovery of the videotapes possessed by the defendants. Once the release was signed by Fiorillo, it was sent by Sbrogna to Sousa with a letter dated May 6, 1998. That letter was marked as Exhibit 2 at the trial in November of 2007. The letter contained the sentence: “Please hold this RELEASE in strict escrow until I receive the enclosed original RELEASE signed by you and Jack." Sbrogna testified that the only contingencies regarding the release were what was reflected in Exhibit 2; namely, that Sousa and Fisher would also sign a release, which was enclosed with the letter, would return a tanning bed that belonged to Fiorillo and would deliver to Sbrogna all originals and copies of the videotapes of the illicit activities. According to Sbrogna, all of those conditions were met by the defendants and he released to Fiorillo $5,000.00 which he had been holding in escrow.
That letter also contained the statement: “Please advise, and I will in turn forward signed Purchase & Sale Agreements to Bennett for his signature.” Sbrogna testified that that statement referred to a sale of the Crystal Palace that was being worked on by the parties, which sale was not related to the release which Fiorillo had signed.
On cross-examination, counsel for Fiorillo inquired about another letter dated May 6, 1998, which is the document which is being challenged as counterfeit. That letter was marked as Exhibit 5. Sbrogna was asked to compare the language contained in the two documents and he did so, indicating that the letters were the same except for the second paragraph. In Exhibit 5, that paragraph read: “Please hold this RELEASE in strict escrow until the completion of the sale to Mr. Fiorillo and at the close my client will formally surrender his ownership interests." Fiorillo’s counsel asked whether the difference in the language in the two letters was material and Sbrogna acknowledged that it was.
On redirect examination by counsel for the defendants, Sbrogna searched through his file to see if he had another copy of Exhibit 5. He did not have a copy of that *118 document in his file and indicated that to his knowledge it did not come from the file of counsel for the defendants. Sbrogna later testified that Exhibit 5 contained language in the second paragraph which was unacceptable to Sousa, so he revised it and sent Exhibit 2 later that same day. According to Sbrogna, he had a specific recollection of the two documents and that it was Exhibit 2 which contained the conditions to which Sousa had agreed.
Fiorillo also testified at the trial in November of2007. He testified that there were settlement discussions among the parties to effect a “corporate divorce.” Fiorillo indicated that among the agreements reached was one which called for him to give up his interest in The Palladium in return for the right to purchase the remaining outstanding stock in The Crystal Palace and the Crystal Palace real estate. Fiorillo testified that the crux of the whole deal revolved around his ability to purchase The Crystal Palace. In response to questions from his counsel, Fiorillo testified that he was quite familiar with both Exhibit 2 and Exhibit 5. In his testimony, Fiorillo indicated that at all times the release was supposed to be held in strict escrow until the sale to him and his new partners of The Crystal Palace had gone through. He testified that he had knowledge of Exhibit 2 on May 6, 1998, but that the letter did not contain the condition he wanted and that he did not authorize Sbrogna to send it. He further testified that Exhibit 5 was the letter which he authorized Atty. Sbrogna to send along with the release. He reiterated in his testimony on cross-examination that the videotapes and the tanning bed were not that important to him; what he wanted was the right to purchase the outstanding shares of The Crystal Palace.
At the conclusion of the trial, the jury was asked one question: “Was there a condition precedent which was not fulfilled and which had to be met before the release could be enforced?” The jury answered the question in the affirmative. Subsequently, I allowed the defendants’ motion for a new trial for reasons not germane to the issues now before me.
Motions to Reopen Discovery and for Sanctions
Subsequently, in May of 2009, the defendants moved to reopen discovery and for an evidentiary hearing to explore the genuineness of the document entered into evidence at the trial as Exhibit 5. Those motions were filed as unopposed. In support of the motions, the defendants submitted affidavits from experts on questioned documents, Paul H. McDonald and Alan T. Robillard. In their affidavits, Mr. McDonald and Mr. Robillard both opined that Exhibit 5 from the trial in November of 2007 is not a genuine document; in their opinions, it is an altered version of the document entered into evidence as Exhibit 2. Also submitted in support of the defendants’ motions were the affidavits of Atty. Sousa, Atty. Sbrogna, and his secretary in 1998, Theresa Supski. Sousa indicated that he never received Exhibit 5 from Sbrogna. In his affidavit, Sbrogna indicated that he first saw Exhibit 5 when it was shown to him during cross-examination at trial. He further indicates that he was surprised by the document and speculated that it may have been an earlier version of Exhibit 2. Finally, he indicated that after examining his file, reviewing his records, including word processing records, and interviewing his secretary, he determined that there was only one version of the letter and that it is Exhibit 2. Ms. Supski stated that she signed Exhibit 2 with the name of Ralph F. Sbrogna and placed her initials after that signature. She stated that Exhibit 5 appears to have been a modification of Exhibit 2, since her signature appears to be identical, which would not be possible in her view, and because the documents have the same word processing designations in the lower left-hand comers, which would not have been the case if they were separate documents. Based on those affidavits, I allowed the motion to reopen discovery for the purpose of deposing the plaintiff and his former counsel at trial as to how Exhibit 5 was created and how and when it came to be in their possession and I set a date for an eviden-tiary hearing.
Counsel for the defendants then sought sanctions against the plaintiff claiming that the plaintiff was deliberately frustrating that discovery by instructing his former trial counsel to assert the attorney-client privilege and by threatening to assert the privilege against self-incrimination at his deposition. I declined to issue any sanctions indicating that the evidentiary hearing would take place as scheduled and that the orders permitting discovery were still in effect. I also ordered that any and all originals or copies of Exhibit 5 were to be produced by the plaintiff and any of his former attorneys.
Evidentiary Hearing
An evidentiary hearing on the defendants’ contention that Exhibit 5 was a counterfeit document was held on August 13-14, 2009.
The first witness was Alan T. Robillard (Robillard), a questioned document examiner and forensic microscopist. Robillard is now retired from his work at the Federal Bureau of Investigation, which included seventeen years in the Federal Bureau of Investigation, with a stint as the chief of the Questioned Document Unit. I find, based on Robillard’s testimony, his curriculum vitae, and the plaintiffs concession, that he was eminently qualified to give the opinions which he gave at the hearing before me.
Robillard examined the documents entered into evidence at the trial in November of 2007, which were marked as Exhibits 2 and 5. He indicated that Exhibit 2 was consistent with a document produced on a word processor. The contents of the document were in alignment vertically and rotationally. Applying an alignment grid to Exhibit 2 showed that the text sat on the grid lines as would be expected from a document produced from a word processor. Also, Exhibit 2 had no nominal height variations in the word RELEASE, which appears five times in that document.
*119 By contrast, Exhibit 5 contained many anomalies which contributed to Robillard’s ultimate opinion that Exhibit 5 was fabricated using Exhibit 2. Using the same grid, Robillard noted that the contents of Exhibit 5 contain several anomalies. The text of the firm’s name at the top of the letter falls to the right, while the text of the second paragraph sits on the line of the grid and the text of the fifth line rises to the right. Those different anomalies cannot happen on the same page of a document, in Robillard’s opinion. He did acknowledge that he supposed there could conceivably be some room for debate on that issue if the document had been folded in some unlikely fashion. So, while the alignment anomalies were strong evidence of fabrication, Robillard did not rest his opinion just on those findings.
There were nominal height variations noted in the size of the letters in the word RELEIASE which appears four times in Exhibit 5. In the questioned paragraph, the letters in the word RELEASE are slightly smaller in the questioned sentence than they are in the rest of the document. Robillard did indicate that photocopying can cause distortion of font sizes; however, he indicated that it would not cause the distortion such that the same word would be smaller in one place on the document than it is in three other places in the same document.
Lastly, Robillard testified that the similarity in the signatures on both Exhibits 2 and 5 is so close that Exhibit 5 must be a fabrication. The location and the positioning of the handwritten letters are almost exactly one-to-one. Of particular note for Robillard was the location of the lower part of the letter “p” in Ralph. In both signature portions, the “p” is in exactly the same position. Robillard testified that the degree of correspondence of the letters of the two signatures is not possible absent some mechanical fabrication. The degree of correspondence between the signatures is decisive, in Robillard’s view, that Exhibit 5 is a fabrication.
Based on all of the anomalies and on the near-precision match of the signatures, Robillard testified that to a reasonable degree of scientific certainty Exhibit 5 is a mechanical fabrication and Exhibit 2 was the model used to create it.
I found Robillard to be a credible witness. His experience, education, and training were not challenged by the plaintiff and I find that he was well-qualified to give the opinions which he gave at the hearing. I accept as credible the conclusions he drew after analyzing the exhibits in question. His opinions were not successfully challenged on cross-examination and the plaintiff offered no expert to rebut his conclusions about the documents in question.
Attorney Sbrogna also testified at the hearing. He indicated that after the trial in November of 2007 he looked for a copy of Exhibit 5 at his office and on his firm’s word processing system. He found nothing indicating that Exhibit 5 was a document created at his office. According to Sbrogna, the system at his office shows the date and time of creation of a document and indicates whether that document has been modified or changed. The information on the system shows that Exhibit 2 was created on May 6, 1998, at 4:17P.M. and shows no other letter on that date regarding the matter.
Sbrogna acknowledged that he testified regarding Exhibit 5 at the earlier trial, but he explained that he was speculating as to how that letter could have been in existence. He testified that he was surprised by Exhibit 5 at the trial because he had reviewed his file and it was not there. He assumed that the document was legitimate and thought he may have overlooked it during his review of the file. His testimony was based on the assumption that the letter was a legitimate copy. He reiterated the testimony which he gave at trial that the deal for the sale of The Crystal Palace was not tied to the release which is the subject of this case.
I accept Sbrogna’s explanation of his testimony at the trial in November of 2007. He was surprised by Exhibit 5 and speculated about how that could have come to be in existence. I recall that Sbrogna appeared surprised when Exhibit 5 was presented to him on cross-examination. I recall him looking for a copy of it in his file and not finding it. While in his testimony at trial Sbrogna did not express any reservation about what he was saying, I find that he likely was taken aback by the exhibit and that he did speculate as to the existence of it and the reasons for it.
Theresa Supski also testified at the hearing. In 1998 she was Sbrogna’s secretary. Ms. Supski stated that she prepared Exhibit 2, but not Exhibit 5. She testified that she would sign Sbrogna’s name to a letter when he authorized her to do so and that she did not use a signature stamp as those were not allowed at the firm. Ms. Supski testified that she would not'have sent out Exhibit 5 as the font alignment is off. She also indicated that if the letter had been a revision of an earlier document, there would have been an indication in the system. I credit the testimony of Ms. Supski.
John Sousa testified at the hearing. He indicated that in May of 1998 he received Exhibit 2, but did not ever receive a copy of Exhibit 5. He testified that he first saw Exhibit 5 at the trial in November of 2007. After the trial, he told his attorney that he had not ever seen Exhibit 5 before. On cross-examination, Sousa indicated that The Crystal Palace deal had nothing to do with the release being referred to in Exhibits 2 and 5.1 found Sousa to be a credible witness.
Finally, Nicholas Fiorillo testified at the hearing. Fiorillo testified that he did not see the two letters of May 6,1998, on that day. He stated thathe was aware of their contents through his discussions with Sbrogna. Fiorillo testified that he has had a number of attorneys throughout the course of this litigation and he denied having exclusive control of his legal files, saying he never had all of the legal materials regarding this matter in his possession. He acknowledged that he moved the files on occasions to new attorneys, but specifically denied hav *120 ing exclusive possession of the files at any time. I find that testimony to be questionable. On my review of the file documents, I find two motions filed in June of 2007 by Mr. Fiorillo pro se. Atty. Erhard had withdrawn as counsel for Fiorillo effective April 26, 2007, and new counsel did not enter an appearance until September 6, 2007. Attached to his motion to extend the tracking order and to allow discovery of the defendants’ business records (Paper #27), filed on June 1, 2007, are copies of documents including the release in question and correspondence, which includes a copy of Exhibit 2 stamped “File Copy.” Fiorillo filed those materials in open court. I find that Fiorillo did have access to his files and to the documents which are the subject of the dispute among the parties.
Fiorillo denied ever creating Exhibit 5 or causing it to be made and he declined to offer an opinion on the legitimacy of Exhibit 5, claiming that he was not an expert and could not draw any conclusions about the legitimacy of the document. I find that while he had motive and opportunity to create Exhibit 5, there is no direct evidence pointing to Fiorillo as the fabricator of Exhibit 5. There is, however, no one else who stood to gain from the creation of that particular counterfeit document.
Findings of Fact
I find that Exhibit 5 is a fabricated counterfeit document. I credit Robillard’s testimony in that regard. I find the testimony of Attys. Sbrogna and Sousa and that of Ms. Supski regarding Exhibit 5 to be credible. I find that Atty. Sbrogna’s testimony at the November 2007 trial was an inaccurate reconstruction of the events surrounding the sending of the release and that the inaccuracy was induced by the fabricated document. I find that Fiorillo did have access to the legal files regarding this matter and, specifically, that he had access to the documents eventually marked as exhibits at the trial, or copies thereof.
While I cannot make a finding that Fiorillo was the person who fabricated Exhibit 5,1 note that the counterfeit document was presented by his counsel at trial[2] and was used to bolster Fiorillo’s contention that there was an unfulfilled condition precedent to the release becoming effective. I find that Fiorillo did have access to his legal files and that he himself submitted a motion to this court which attached some of the documents which became exhibits at trial.
I find that Exhibit 5 was a key document which may well have led the juxy to the verdict it reached. At trial, Fiorillo testified that Exhibit 5 was the letter which he authorized Sbrogna to send along with the release. Given my finding that Exhibit 5 was a fraudulent document, I find that Fiorillo’s testimony with regard to that document was not truthful.
The insertion of Exhibit 5 into the trial was designed to influence the jurors’ determination of the sole issue before them and I find that it is likely that it did so. Without Exhibit 5, there was no documentary support for the plaintiffs position. That document provided support for the plaintiffs argument that the release was contingent upon the sale of The Crystal Palace to Fiorillo and his new partners. That document induced Atty. Sbrogna to speculate and to create the explanation for its existence which he provided to the jury. Sbrogna’s acknowledgment in the midst of the defendants’ case that there had been discussion along the lines ultimately testified to by Mr. Fiorillo gave credence to the plaintiffs position at trial.
Sanction
The presentation of a fabricated piece of evidence which was intended to influence the trial of this matter merits a severe sanction. The defendants argue that dismissal is the only appropriate sanction in this situation. The plaintiff argues that if the Court determined that a sanction was warranted, any taint of the jury’s verdict has already been cured due to the fact that I have already ordered a new trial on other grounds.
“The ultimate sanction of dismissal is not limited to instances of behavior that are technically defined as fraud on the court.” Munshani v. Signal Lake Venture Fund II, Inc., 60 Mass.App.Ct. 714, 721 (2004). Whether the fabrication of Exhibit 5 meets all of the technical requirements of fraud on the court, I find that dismissal is the appropriate sanction here. Exhibit 5, a fraudulent document, was placed into evidence by the plaintiff at the trial of this matter and, in all likelihood influenced the jurors in reaching their verdict. Such a subversion of the legal process cannot be countenanced. I echo Judge Van Gestel’s words, repeated by the Appeal Court, in imposing the ultimate sanction of dismissal in the Munshani case: “All courts are at the mercy of litigants and their advocates ... in the often difficult search for truth. The ability to discover fraud in the process is greatly limited. Thus the imposition of strong sanctions is one of the very few ways of deterring such activiiy in the future. This Court intends such a message here.” Id. at 720-21. The complaint in this matter is dismissed.
ORDER
For the foregoing reasons, the complaint of the plaintiff is DISMISSED with prejudice and the plaintiff is ORDERED to reimburse the defendants for the costs and fees of Paul H. McDonald and Alan T. Robillard and for the fees and expenses reasonably charged by counsel for the defendants for all matters relating to the discovery of and proof of the fabrication of Exhibit 5. Counsel for the defendants shall submit an affidavit attesting to those costs and setting out in detail those activities and the time spent thereon in establishing the fraudulent nature of Exhibit 5.

The attorney-client relationship broke down at some point and there was litigation between Fiorillo and Sbrogna, which apparently was settled.

I do not have any evidence whatsoever that Fiorillo’s trial counsel was involved in the fabrication of Exhibit 5.